**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

IN RE:

PEDRO JUAN MARRERO ASTACIO          Case No.: 25-21843-LSS

     *Debtor,*                                        Chapter 7

HUGHES CONSTRUCTION
MANAGEMENT, INC.

     *Plaintiff,*

                                             Adv. Proc. No.: _____

     **v.**

PEDRO JUAN MARRERO ASTACIO

     *Defendant.*

**PLAINTIFF HUGHES CONSTRUCTION MANAGEMENT, INC.'S
COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO
11 U.S.C. § 523(a)(2)(A)**

**COMES NOW**, Plaintiff, **HUGHES CONSTRUCTION MANAGEMENT, INC.**

("Hughes"), by and through undersigned counsel, and files this Complaint against Defendant

/ Debtor **PEDRO JUAN MARRERO ASTACIO** ("Marrero" or "Debtor" or "Defendant")

to determine that the debt owed by Marrero to Hughes is nondischargeable pursuant to 11

U.S.C. § 523(a)(2)(A), and in support thereof, states as follows:

**INTRODUCTION**

1.     This adversary proceeding arises from Marrero's May 2022 solicitation of

emergency, short-term funding needed to close on the acquisition of the Sure Stay Hotel by

Best Western located at 5859 American Way, Orlando, Florida.

2.      Marrero obtained Hughes' funds by representing that the transaction was a short-term, highly protected loan opportunity backed by imminent repayment sources, personal guaranties, and available real-property collateral.

3.      Marrero represented, among other things, that approximately $4.5 million would be received within 45 to 60 days and that Hughes would be repaid first from those funds.

4.      Marrero also represented that the loan would be personally guaranteed, that Hughes' position could be reinforced by real-property collateral, and that a lien could be placed on the hotel being acquired.

5.      Marrero transmitted those representations as part of a same-day closing package, on an urgent timeline, and requested that Hughes act immediately because the funds had to be wired and the acquisition had to close the next day.

6.      Relying on Marrero's representations and omissions, Hughes wired $300,000.00 to the closing agent for the hotel acquisition on May 13, 2022.

7.      However, Marrero did not cause Hughes to be repaid within 60 days, did not cause Hughes to be repaid from the promised $4.5 million, and did not cause Hughes to receive the collateral protection he represented was available.

8.      Hughes later obtained a final judgment against Marrero in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida, in the amount of $650,669.56, plus post-judgment interest, with jurisdiction reserved as to reasonable attorneys' fees and costs.

9.      Hughes does not seek to relitigate the amount of the Florida judgment in this adversary proceeding, but rather, seeks a determination that the judgment debt is excepted

from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) because Marrero obtained Hughes' funds through false pretenses, false representations, and actual fraud.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

11. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), because Hughes seeks a determination as to the dischargeability of a particular debt.

12. Venue is proper in this District because Marrero filed his Chapter 7 bankruptcy case in this Court.

## PARTIES

13. Hughes is a Florida corporation with a principal place of business in Lakeland, Florida.

14. Marrero is an individual debtor who filed a petition for relief under Chapter 7 of the Bankruptcy Code in this Court.

15. Marrero is the debtor in the underlying, main bankruptcy case, styled and captioned as In re Pedro Juan Marrero Astacio, Case No. 25-21843-LSS.

16. Hughes is a creditor of Marrero by virtue of the Florida judgment described herein.

## FACTUAL ALLEGATIONS

A.    **The Florida Judgment Debt**

17. On or about December 6, 2023, Hughes commenced an action in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida, against Radix Hawk Holdings, LLC, Marrero, James T. Hannon, and Peter C. Sackel, styled and captioned as Hughes Construction Management, Inc. v. Radix Hawk Holdings, LLC, Pedro Marrero a/k/a

Pedro Juan Marrero Astacio a/k/a Pedro J. Marrero Astacio, James T. Hannon, and Peter C. Sackel, Case No. 2023-CA-017347-O.

18.     The Florida action arose from the May 2022 short-term loan transaction described herein.

19.     The Florida complaint asserted claims for breach of promissory note, breach of continuing guaranty, establishment and foreclosure of equitable lien, money lent, and unjust enrichment.

20.     On or about October 29, 2024, the Florida court entered a Final Judgment After Default Against Defendant Pedro Marrero as to Count II – Breach of Continuing Guaranty.

21.     The Florida judgment provides that Hughes shall recover from Marrero $480,000.00, plus prejudgment interest of $170,669.56, for a total of $650,669.56, bearing interest at the rate stated in the judgment and adjusted as provided by applicable law.

22.     The Florida judgment further provides that Hughes is entitled to recover reasonable attorneys' fees and costs from Marrero, with jurisdiction reserved for determination of the amount of such fees and costs.

23.     The Florida judgment remains unpaid.

**B.      Marrero's Relationship With Hughes and His Position of Trust**

24.     Before the May 2022 loan solicitation, Marrero had cultivated a business relationship with Hughes through real estate development and construction-management dealings.

25.     Marrero held himself out to Hughes as an experienced real estate development professional with access to substantial real estate projects, development opportunities,

investors, lenders, and operating partners.

26. Marrero communicated with Hughes using professional signature blocks identifying himself as a licensed partner, development-services professional, and/or managing partner associated with Engel & Völkers Orlando Downtown and Radix Hawk.

27. Marrero used that existing relationship, along with the appearance of professional credibility, ongoing projects, and lender-backed real estate activity, to solicit Hughes' participation in the May 2022 emergency loan transaction.

**C.      Marrero's May 12, 2022 Solicitation of the Short-Term Loan**

28. On May 12, 2022, at approximately 11:04 p.m., Marrero emailed Jason Hughes with the subject line "Additional Information Hotel Loan Opportunity."

29. The email was copied to Pete Sackel and Purnima Marrero.

30. Marrero began the email by thanking Hughes for considering "our debt opportunity" and stated that he was grateful for Hughes' "friendship, trust and partnership."

31. Marrero stated that the property involved was the Sure Stay Hotel by Best Western, located at 5859 American Way, Orlando, Florida.

32. Marrero represented that approximately $9 million was being applied to the hotel at approximately 55% loan-to-value.

33. Marrero represented that the property would be improved by rebranding, professional management, construction of an approved 142-key addition on approximately 1.5 vacant acres, and exterior and interior enhancements.

34. Marrero represented that the need for emergency funding was caused by a "surprise necessity" to provide approximately $750,000.00 for nine months of interest reserves at closing.

35. Marrero represented that this unexpected closing need created the need to raise capital at a significant interest/return premium relative to the market.

36. Marrero identified several other projects and properties, including:

a. The Station Ground Up Multi-Family Development, described as a 325-unit ground-up development in Kissimmee, Florida, with a projected project size of approximately $75 million and a projected groundbreaking in September 2022;

b. Clarion Hotel to Multi-Family Conversion, described as a $13 million project;

c. Brensus Commercial, described as a $3 million project;

d. Ft. Meyers 182 Build-to-Rent Home Ground Up Development, described as a $40 million project; and

e. Florida and South Carolina Hotel Portfolio, described as a 1,200-key, value-add, $150 million acquisition.

37. Marrero represented that his group was receiving approximately $4.5 million in 45 to 60 days from the sale of hotels and construction partners.

38. Marrero represented that the $4.5 million would be used as initial capital investment to rebrand the hotel, finalize entitlement, obtain permit approval, and commence construction of the new hotel tower.

39. Critically, Marrero represented to Hughes: "We will first pay back our obligations to you from those funds, then reinvest the rest into the enhancement of this property."

40. Marrero represented that Hughes' loan would be personally guaranteed.

41. Marrero represented that Hughes' position could be reinforced by real-property collateral.

42. Marrero identified collateral options including approximately 3.5 acres of vacant land in Kissimmee, Florida, which he represented had an estimated value of approximately $1 million and no encumbrances.

43.     Marrero also identified a commercial office property located at 1110 Highway A1A, Satellite Beach, Florida, which he represented had been appraised earlier that year at approximately $2.2 million, with a mortgage balance of approximately $750,000.00 and more than $1.4 million in equity.

44.     Marrero further represented that a lien could be placed on the hotel being acquired.

45.     Marrero represented that the debt sought from Hughes' group was between $375,000.00 and $750,000.00.

46.     Marrero represented that the debt would be repaid within 60 days for a total return of capital and interest of $600,000.00 if Hughes' group funded the full amount requested.

47.     Marrero pressed Hughes to decide immediately, stating that the funds had to be wired and that the acquisition had to close the next day.

48.     Marrero's May 12, 2022 email attached or referenced a substantial package of documents intended to induce Hughes to fund, including a promissory note, personal guaranty, tenant information, property information, debt information, a settlement statement, acquisition model, Hannon biography, Hannon personal financial statement, Shailesh Patel resume, offering deck, and other project materials.

49.     The attached materials were intended to create the appearance that Hughes' short-term loan would be supported by a legitimate acquisition transaction, substantial project assets, imminent repayment sources, collectible guarantors, and available collateral.

**D.      Negotiation and Execution of the Loan Documents**

50.     On May 13, 2022, Hughes reviewed the proposed documents under severe

time pressure created by Marrero's representation that the acquisition had to close that day.

51.     Hughes requested changes to the draft loan documents, including removal of an extension option and preparation of separate loan documents for the Hughes loan and another lender's loan.

52.     Hughes stated that the Hughes loan would be a 60-day loan of $300,000.00 with a total payoff of $480,000.00.

53.     Marrero responded that, due to Florida regulations, the documents should disclose the lump-sum payment rather than the interest rate.

54.     The promissory note ultimately provided that Radix Hawk Holdings, LLC would repay Hughes $480,000.00 on or before July 13, 2022.

55.     The promissory note represented that Hughes would have lien rights relating to the hotel located at 5859 American Way, Orlando, Florida, in the event of default.

56.     The promissory note also referenced real estate collateral located at 1110 Highway A1A, Satellite Beach, Florida.

57.     Marrero executed the promissory note on behalf of Radix Hawk Holdings, LLC as "Managing Partner."

58.     The continuing guaranty identified the loan from Hughes to Radix Hawk Holdings, LLC in the amount of $300,000.00, evidenced by the May 13, 2022 promissory note.

59.     The continuing guaranty further stated that Radix Hawk Holdings, LLC agreed to pay Hughes the full sum of $480,000.00 within 60 days.

60.     Marrero executed the continuing guaranty personally.

61.     At the time of the transaction, Marrero did not disclose to Hughes that any

material issue existed concerning his authority to bind Radix Hawk Holdings, LLC, to execute loan documents on its behalf, to represent that Hughes' position could be protected by collateral, or to cause Hughes to be repaid from the represented repayment sources.

**E.     Hughes' Reliance and Funding**

62.     Hughes relied on Marrero's representations that the loan was short-term, that repayment would occur from imminent capital to be received within 45 to 60 days, that Hughes would be repaid first from those funds, that the obligation would be personally guaranteed, that real-property collateral was available, and that a lien could be placed on the hotel.

63.     Hughes also relied on Marrero's transmission of the guaranty, promissory note, Hannon financial information, hotel acquisition materials, settlement information, property information, and project materials as support for the transaction.

64.     Hughes would not have wired $300,000.00 had Marrero disclosed that repayment depended on uncertain future capital that Marrero did not control, that the collateral structure was not as represented, that Marrero's authority to bind Radix Hawk Holdings, LLC or offer collateral was materially limited or disputed, or that the guaranty/financial support package did not provide the protection represented.

65.     On May 13, 2022, Hughes wired $300,000.00 to Dominion Title Company's escrow account for the Sure Stay Hotel closing.

66.     The wire was for the benefit of Radix Hawk Holdings, LLC and was used to fund the acquisition of the hotel located at 5859 American Way, Orlando, Florida.

67.     On or about May 16, 2022, Marrero asked Hughes and another lender to respond to an email confirming that the funds were sent to be used for the benefit of Radix

Hawk Holdings, LLC to purchase the property located at 5859 American Way, Orlando, Florida.

68.     Hughes provided the requested confirmation.

**F.      The Representations Were False or Materially Misleading When Made**

69.     Marrero's representations were false, materially misleading, or made with reckless disregard for their truth when made.

70.     Marrero represented that Hughes would be repaid first from approximately $4.5 million expected within 45 to 60 days.  In fact, the represented repayment source did not materialize, was not within Marrero's control, and was materially more speculative than Marrero had disclosed.

71.     Marrero failed to disclose that repayment depended on uncertain third-party capital and future transactions rather than a presently available, committed, and controlled repayment source.

72.     Marrero represented that Hughes' loan was backed by personal guaranties and collateral protection.  In fact, Hughes did not receive the perfected collateral position that Marrero represented was available.

73.     Marrero represented that a lien could be placed on the hotel being acquired. In fact, Hughes did not receive a recorded lien or mortgage on the hotel at closing, and the hotel was being acquired in a transaction involving existing acquisition financing and competing interests.

74.     Marrero represented that Hughes' position could be reinforced by additional real property.  In fact, Marrero did not cause enforceable, perfected collateral rights in favor of Hughes to be granted in the additional real property described in the solicitation.

75. Marrero executed the promissory note on behalf of Radix Hawk Holdings, LLC as "Managing Partner," but documents obtained after the transaction reflect that the ownership, management, and authority structure of Radix Hawk Holdings, LLC was materially more complex than Marrero had disclosed.

76. Marrero did not disclose to Hughes that his authority to bind Radix Hawk Holdings, LLC, to incur debt, to grant collateral, or to represent the availability of collateral was limited, disputed, or dependent on the consent of others.

77. Marrero transmitted financial and guaranty information concerning James Hannon as part of the solicitation package intended to induce Hughes to fund.

78. Hughes relied on the apparent existence and collectability of the guaranty package as part of its decision to fund.

79. Upon information and belief, the financial support and guaranty package was materially misleading and did not provide the level of repayment protection represented by Marrero.

80. Marrero further failed to disclose that Radix-related projects were undercapitalized, dependent on continued infusions of investor capital, and unable to provide reliable repayment on the short-term timeline represented to Hughes.

81. Marrero's omissions were material because Hughes was being asked to wire $300,000.00 immediately, under a same-day closing deadline, in reliance on the truth and completeness of Marrero's representations.

**G.     Marrero's Knowledge, Reckless Disregard, and Intent to Induce Hughes' Reliance**

82. Marrero knew, or acted with reckless disregard of the truth, that his representations and omissions were materially false or misleading.

83.     Marrero was not a passive participant in the transaction:  He solicited the loan, transmitted the supporting documents, negotiated the loan documents, signed the promissory note on behalf of Radix Hawk Holdings, LLC, personally signed the guaranty, and directed the funding process.

84.     Marrero also held himself out as the person driving the projects, capital, structure, and transaction details.

85.     Shortly after the May 2022 transaction, Marrero admitted in a written communication that he was "the driver of projects, Capital, structure and a variety of other details."

86.     In the same communication, Marrero admitted that the business lacked capital, that he had to continue bringing in investor capital to cover expenses and close deals, and that accounts had become negative.

87.     Marrero also admitted in that communication that, in connection with another acquisition effort, he had altered a screenshot of an account balance by adding a digit so that approximately $1 million appeared to be approximately $51 million.

88.     Marrero further admitted that, before the Sure Stay Hotel closing, he "did not even look" at relevant operating agreements and was focused on closing.

89.     Those admissions support the inference that Marrero knew, before and during the May 2022 hotel-closing period, that Radix-related projects were undercapitalized, dependent on new investor capital, and burdened by unresolved authority, capital, and financing issues.

90.     Those admissions further support the inference that Marrero was willing to use inaccurate or incomplete financial information to induce counterparties to proceed with

real estate transactions.

91. Marrero intended Hughes to rely on his representations because Marrero needed Hughes' funds to close the hotel acquisition the next day.

92. Marrero intended Hughes to rely on the promised 45-to-60-day repayment source, the personal guaranties, the represented collateral, and the apparent financial support because Marrero knew Hughes would not wire $300,000.00 without sufficient assurance of repayment and protection.

93. Marrero's representations and omissions were designed to overcome Hughes' concerns and induce immediate funding before Hughes could fully investigate the authority structure, collateral availability, repayment sources, guarantor collectability, and underlying project risk.

**H.     Post-Funding Conduct Further Shows the Fraudulent Nature of the Transaction**

94. Marrero did not cause the debt to be repaid by July 13, 2022.

95. After the promised repayment deadline passed, Marrero continued to make statements designed to delay enforcement and preserve the appearance that repayment was imminent.

96. On or about August 19, 2022, Marrero emailed Hughes and Joyce Jessurum apologizing for failing to repay the funds lent to close the Sure Stay Hotel acquisition.

97. Marrero acknowledged that Hughes and Jessurum placed significant trust in him and that he had not delivered on his commitment.

98. Marrero stated that the expected partner capital had not been received, that 90 days had passed, and that he doubted such capital would ever come from those partners.

99. Marrero further acknowledged that he had made commitments to Hughes

based on a new partner's word and agreements.

100.    Marrero acknowledged that he was ultimately responsible for the commitments he made to Hughes.

101.    Marrero then represented that a cash-out refinance of the hotel would provide the capital needed to repay Hughes, and that he expected to be able to close approximately 30 days after receiving a commitment letter.

102.    Marrero represented that he would make the situation right approximately 30 days later.

103.    Marrero did not repay Hughes approximately 30 days later.

104.    On or about June 13, 2023, Marrero again represented that there was "good news" from a lender and that the loan would close, with an estimated closing between the first and second week of July.

105.    That loan did not result in repayment to Hughes.

106.    Marrero's post-funding statements further demonstrate that the original repayment representations were not supported by a reliable, committed repayment source and that Marrero continued to use representations of imminent financing to delay enforcement.

107.    Hughes eventually filed the Florida action and obtained the Florida judgment against Marrero.

108.    Marrero's debt to Hughes was obtained by false pretenses, false representations, and actual fraud and should not be discharged in Marrero's Chapter 7 case.

## COUNT I
### (Nondischargeability Pursuant to 11 U.S.C. § 523(a)(2)(A))

109.    Hughes incorporates the foregoing paragraphs as though fully set forth herein.

110.    Section 523(a)(2)(A) excepts from discharge debts for money, property,

services, or credit obtained by false pretenses, false representations, or actual fraud.

111.   Marrero obtained Hughes' $300,000.00 through false pretenses, false representations, and actual fraud.

112.   Marrero made express representations to Hughes, including, but not limited to, the following:

a. That Hughes was being offered a short-term debt opportunity needed to close on the Sure Stay Hotel acquisition;

b. That approximately $4.5 million would be received within 45 to 60 days;

c. That Hughes would be repaid first from those funds;

d. That Hughes' loan would be personally guaranteed;

e. That Hughes' position could be reinforced by real-property collateral;

f. That the Kissimmee vacant land identified in the solicitation had substantial value and no encumbrances;

g. That the Satellite Beach commercial office property identified in the solicitation had substantial equity;

h. That a lien could be placed on the hotel being acquired;

i. That the guaranty and financial support package transmitted with the solicitation provided meaningful repayment protection; and

j. That Marrero had authority to sign, bind, and cause Radix Hawk Holdings, LLC to perform the obligations represented in the transaction documents.

113.   Marrero also concealed and failed to disclose material facts, including, but not limited to, the following:

a. That repayment depended on uncertain, uncommitted, and uncontrolled future capital;

b. That the represented 45-to-60-day repayment source was materially more speculative than Marrero had disclosed;

c. That Radix-related projects were undercapitalized and dependent on continued investor funding;

d. That Hughes would not receive the perfected collateral position represented by Marrero;

e. That there were material limitations, disputes, or issues concerning Marrero's authority to bind Radix Hawk Holdings, LLC, incur debt, or grant collateral;

f. That the guaranty and financial support package did not provide the level of protection represented; and

g. That the transaction involved risks and authority issues that were inconsistent with Marrero's urgent representation that Hughes' loan was protected by imminent repayment sources, guaranties, and collateral.

114. Marrero's representations and omissions were material.

115. Marrero knew the representations were false or materially misleading when made, or made them with reckless disregard for their truth.

116. Marrero intended Hughes to rely on the representations and omissions.

117. Hughes actually relied on Marrero's representations and omissions by wiring $300,000.00 to fund the hotel acquisition.

118. Hughes' reliance was justifiable under the circumstances, including because Marrero transmitted a detailed solicitation package, loan documents, guaranty documents, property information, financial information, settlement materials, and professional communications under an urgent closing deadline.

119. Hughes would not have wired the $300,000.00 absent Marrero's representations and omissions.

120. As a direct and proximate result of Marrero's false pretenses, false representations, and actual fraud, Hughes suffered damages.

121. The debt arising from Marrero's conduct was reduced to judgment in the Florida action.

122. The Florida judgment debt, including the principal amount, prejudgment

interest, post-judgment interest, attorneys' fees, costs, and any other amounts recoverable under or arising from the Florida judgment and the underlying loan documents, is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff **HUGHES CONSTRUCTION MANAGEMENT, INC.** and against Defendant / Debtor **PEDRO JUAN MARRERO ASTACIO**, as follows:

A.      **DETERMINING** that the debt owed by Marrero to Hughes arising from the May 2022 loan transaction and the Florida judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

B.      **DETERMINING** that the nondischargeable debt includes, without limitation, the $650,669.56 Florida judgment amount, post-judgment interest, attorneys' fees and costs to the extent awarded or recoverable, and any other amounts recoverable under or arising from the Florida judgment and underlying loan documents;

C.      **AWARDING** Hughes its costs in this adversary proceeding;

D.      **AWARDING** Hughes its reasonable attorneys' fees to the extent permitted by contract, judgment, statute, rule, or applicable law; and

E.      For such other and further relief as the nature of this cause may require.

**CORPORATE OWNERSHIP STATEMENT PURSUANT TO FRBP 7007.1**

Hughes states that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

**STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 7012-1**

Hughes consents to the entry of final orders and judgments by the Bankruptcy Court in this adversary proceeding.

Dated: April 29, 2026                                     Respectfully submitted,

/s/ Jisoo Kim, Esquire
Jisoo Kim, Esq. (#21146)
Paré and Associates, LLC
20300 Seneca Meadows Pkwy, Ste 210
Germantown, MD 20876
(240) 247-3722
jisoo@alicelaw.com
*Counsel for Plaintiff*
*Hughes Construction Management, Inc.*